## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 21 2016, 9:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Stephen E. Reynolds
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil Commitment of B.J.,

*Appellant-Respondent,*

v.

Eskenazi Hospital/Midtown CMHC,

*Appellee-Plaintiff.*

October 21, 2016

Court of Appeals Case No.
49A02-1603-MH-413

Appeal from the Marion Superior Court

The Honorable Amy Jones, Special Judge

Trial Court Cause No.
49D08-1508-MH-27580

**Pyle, Judge.**

# Statement of the Case

B.J. appeals the trial court's order for his involuntary regular civil commitment.[1] On appeal, he argues that there was not sufficient evidence to support his commitment because there was no evidence that he was gravely disabled. In response, Eskenazi Hospital/Midtown CHMC ("Eskenazi") asserts that there was sufficient evidence that B.J. was gravely disabled and, regardless, there was sufficient evidence that B.J. was dangerous. Because we conclude that there was not sufficient evidence to support B.J.'s involuntary commitment, we reverse and remand.

We reverse and remand.

# Issue

Whether there was sufficient evidence to involuntary commit B.J. to a regular civil commitment.

# Facts

On August 18, 2015, B.J. was detained at Eskenazi on an emergency basis after a clinician reported that he was "psychotic and unable to use reasonable

---

[1] In *Civil Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Mental Health*, 23 N.E.3d 29, 33 n.2 (Ind. Ct. App. 2014) (internal citations omitted), *trans. denied*, we explained that:

> In general, there are three types of commitments: An emergency detention limits the detention of an individual to seventy-two hours. A temporary commitment may be authorized for up to ninety days. A regular commitment is the most restrictive form of involuntary treatment and is proper for an individual whose commitment is expected to exceed ninety days.

.

judgment." (App. 17).  Dr. Xiaoxi Ouyang ("Dr. Ouyang"), a physician at Eskenazi, examined B.J. and filed a report stating that he had a psychiatric disorder.  Specifically, she noted that B.J. had been:

> making death threats, rape threats, [and] lawsuit threats to multiple people.  Multiple people [were] in fear for safety because of this patient[.]  [He] prev[iously] attempted to choke [his] ex-wife due to delusions/impairing judgment[.]  [He]'s a danger to others.

(App. 21).  She concluded that B.J. had no insight into his illness and recommended that he be committed to Eskenazi on a temporary basis for treatment.

[4]  On August 26, 2015, the trial court held a hearing on Dr. Ouyang's commitment petition and ordered B.J. committed on a temporary basis not to exceed ninety days.  Before that ninety days had expired, B.J.'s psychiatrist at Eskenazi, Dr. Mary Salama ("Dr. Salama"), filed a report in which she requested that the court extend the temporary commitment.  The trial court held a hearing on the report on November 16, 2015, and, with B.J.'s agreement, ordered that he complete a second temporary commitment on an out-patient basis and with an end-date of February 14, 2016.

[5]  On January 22, 2016, Dr. Salama filed another report requesting an extension of B.J.'s second temporary commitment to a regular commitment.  She claimed that B.J. had missed two treatment appointments in the previous three weeks and had rescheduled another.  She also noted that B.J.'s family had continued to report that he had "ma[d]e threats by body language." (App. 57).  She

opined that B.J. could be a threat to others as a result of his paranoid delusions if he chose to stop taking his medications. However, she did not allege that B.J. had stopped taking his medication during his temporary commitment.

[6] Because of B.J.'s two missed appointments, Eskenazi filed a petition for his return to the hospital, which the trial court granted. When B.J. was admitted to the hospital, the dosage of his medicine had to be increased because he was showing signs of paranoia. B.J. also refused to take a drug test. However, the hospital was able to release him back to his out-patient status after five days.

[7] Subsequently, on February 9, 2016, the trial court held a hearing on Dr. Salama's report requesting to extend B.J.'s temporary commitment to a regular commitment. At the hearing, Dr. Salama testified that she had diagnosed B.J. with delusional disorder, persecutory type; substance abuse disorder; and narcissistic personality disorder. She had prescribed him a monthly injection, haliperidone, and she acknowledged that B.J. had complied with receiving those injections. However, she also testified that she believed B.J. was "gravely disabled" because of his mental illness and that his delusional disorder affected his ability to function independently because "the constant sense of paranoia, sense that he is being tracked and watched makes him get very angry easily." (Tr. 21). When asked whether she believed there was a risk that B.J. would harm himself or others, Dr. Salama responded, "If he does not—if he does not stick with the treatment and treatment plan, he will eventually deteriorate to— to where (indiscernible)." (Tr. 21). When asked whether B.J. could provide himself with food, clothing, shelter or other essential human needs, Dr. Salama

replied, "Well, there is going to be a[n] escalation in the symptoms which at the one point he's not going to be able to reach that. He's always supported now by his parents. He lives with them and they—they help him out." (Tr. 18-19). She also noted that B.J. had received a misdemeanor charge in the prior ninety days, but she did not clarify the nature or circumstances of the charge.[2]

[8] At one point during Dr. Salama's testimony, it is apparent that B.J. physically reacted because the trial court interrupted the proceedings to tell B.J. to calm down. B.J. responded: "I am sorry. I just heard false statements. I'm sorry." (Tr. 24). The proceedings then continued, and B.J. did not have any more outbursts.

[9] After Dr. Salama's testimony, B.J. testified and explained that he had missed the two treatment appointments because of his work schedule. He said that he had gotten a new job as a car broker after his previous November 16 temporary commitment hearing and had begun to work seventy hours per week. He also testified that he was "able to dress [himself] and [shower and []] get to work and be a normal, productive member of society." (Tr. 41). He testified that he planned to live with his parents for six months while he saved up money because he had recently divorced his wife. However, he testified that he frequently traveled by himself and was able to take care of himself on those occasions. He also agreed to continue to take his medicine and participate in

---

[2] The charging information is not a part of the record.

treatment without a regular commitment. As for the misdemeanor charge he had received, B.J. testified that the charge was based on an incident that had occurred a year and a half earlier, before he had begun treatment. He said that the charges had been filed when he moved away for a year, and there had been a warrant for his arrest when he came back.

[10] At the conclusion of the hearing, the trial court granted Eskenazi's request to extend B.J.'s temporary commitment into a regular commitment. As a basis for its decision, the trial court stated to B.J.:

> I don't get the impression that you think you have a mental health diagnosis. . . . I still see that there is – there's absolutely no insight into your illness. There is no insight even into your behavior and how you act around people. And I can tell if you act this way in front of me, I don't know what you've done in front of these doctors. When they are trying to have you do things that you don't want to do. And we're at a point now where there is no way that – that you can be given that much leeway to go out and do this on your own. Because, you can't follow the Court's order to do what the doctors tell you to do now. . . . The fact that you have – they have had to increase your injection due to your medication. Due to your – your thoughts. That [it] was a lengthier stay than normal[.] That's not a punishment for failing to appear to an appointment. That is because you had delusions that were going on and you needed to be treated and you were not in a place where you could be released back to the community.

(Tr. 66-68). B.J. now appeals.

## Decision

On appeal, B.J. argues that there was insufficient evidence to support his involuntary commitment because Eskenazi did not prove by clear and convincing evidence that he was "gravely disabled," as defined by statute.[3] Eskenazi responds that there was sufficient evidence that B.J. was "gravely disabled," or, alternatively, that he was a danger to others, which is another statutory ground for an involuntary commitment.

"'[T]he purpose of civil commitment proceedings is dual:  to protect the public and to ensure the rights of the person whose liberty is at stake.'" *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *In re Commitment of Rogers*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000)). The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements.  *Id.*  To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by "'evidence . . . [which] not only communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment, but . . . also has the function of reducing the chance of inappropriate involuntary commitments.'"  *Id.* (quoting *Commitment of J.B. v.*

---

[3] B.J. characterizes his argument as a due process claim, but we conclude that it is essentially a sufficiency of the evidence claim.

*Midtown Mental Health Ctr.*, 581 N.E.2d 448, 450 (Ind. Ct. App. 1991) (citations omitted), *trans. denied*).

[13] To obtain an involuntary regular commitment of an individual, a "'petitioner is required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate.'" *Id.* (quoting IND. CODE § 12-26-2-5(e)). In *T.K.*, our supreme court recently criticized a line of cases in which this Court did not adequately apply the clear and convincing standard of review and instead affirmed civil commitment orders if such an order "'represent[ed] a conclusion that a reasonable person could have drawn, even if other reasonable conclusions [were] possible.'" *Id.* (quoting *M.L. v. Meridian Servs., Inc.*, 956 N.E.2d 752, 755 (Ind. Ct. App. 2011)). The supreme court emphasized that we should instead apply the clear and convincing evidence standard, which is defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *T.D. v. Eskenazi Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* In reviewing the sufficiency of the evidence supporting a civil commitment, we will not reweigh the evidence or assess witness credibility. *See id.* Moreover, we will consider only the probative evidence and the reasonable inferences supporting the judgment. *See id.*

[14] B.J. does not dispute the trial court's finding that he is mentally ill. However, he argues that there was not sufficient evidence to support the trial court's

conclusion that, as a result of his mental illness, he is "gravely disabled."

INDIANA CODE § 12-7-2-96 defines "gravely disabled" as:

> [A] condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
>> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>>
>> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Because this statute is written in the disjunctive, a trial court's finding of grave disability survives if we find that there was sufficient evidence to prove either that the individual was unable to provide for his basic needs or that his judgment, reasoning, or behavior was so impaired or deteriorated that it resulted in his inability to function independently. *T.D.*, 40 N.E.3d at 510.

[15]    In support of his argument that he is not gravely disabled, B.J. cites to our supreme court's decision in *T.K.* There, our supreme court found that T.K. was not gravely disabled even though he had "continuously refused treatment, [had] denied that he [had] any problem, and [had] been an aggressor in several areas of his life." *T.K.*, 27 N.E.3d at 275. As in the instant case, T.K. had been "paranoid over a wide range of . . . institutions as persecuting him." *Id.* at 274. He put flyers of a person's criminal record on windshields in order to "hurt" or "aggravate" that person and screamed at the staff in an Adult and Child Clinic in a manner that made the staff there concerned. *Id.* A resident in psychiatry at

the hospital where T.K. was admitted testified that he had "'observed [T.K.'s] aggressive, disruptive behavior towards [his] attending physician,' that 'other patients ha[d] complained about . . . being fearful of him, and of his aggression,'" and that the workers at the Adult and Child Clinic "felt threatened enough that they want[ed] to know if [T.K. was going to be] released, because they [were] fearful of T.K.'s physical violent behavior." *Id.* at 275. T.K.'s son was concerned because T.K. had military experience and had displayed erratic and aggressive behavior, including mentioning the use of violence in emails and on Facebook. *Id.*

[16] On appeal, our supreme court reversed T.K.'s commitment, finding that there was not sufficient evidence that he was "gravely disabled." Specifically, the supreme court noted that both T.K. and the hospital psychiatry resident had testified that T.K. rented his home, lived by himself, held full-time employment, and owned two vehicles while making payments on a third. *Id.* at 276. The court thus found that "[n]o evidence was presented to dispute his ability to provide food, clothing, or shelter for himself." *Id.* Further, the court found that there was not clear and convincing evidence that T.K. was unable to function independently. It reasoned that, while T.K.'s behavior was aggressive, he had not made any physical outbursts, destroyed any property, or put himself or others in actual danger. *Id.* at 277. The court concluded that "at best, the evidence suggests that T.K.'s loud, boisterous, and rude public behavior harmed his reputation and made others not want to be around him." *Id.* According to the court, that was "not sufficient evidence to support a civil commitment on

grounds of grave disability." *Id.* Finally, the court noted that a denial of mental illness and refusal to medicate were "insufficient to establish grave disability because they [did] not establish, by clear and convincing evidence, that such behavior 'result[ed] in the individual's inability to function independently.'" *Id.* at 276.

Here, Dr. Salama was the only witness who testified that B.J. had a grave disability. When asked whether B.J. could provide himself with food, clothing, shelter, or other essential human needs, Dr. Salama replied, "Well, there is going to be a[n] escalation in the symptoms which at the one point he's not going to be able to reach that. He's always supported now by his parents. He lives with them and they—they help him out. Before that he was in a restrictive environment." (Tr. 18-19). When asked whether she believed there was a risk that B.J. would harm himself or others, Dr. Salama responded, "If he does not—if he does not stick with the treatment and treatment plan, he will eventually deteriorate to – to where (indiscernible)." (Tr. 21). In both of these instances, Dr. Salama evaluated B.J.'s hypothetical state based on future contingencies. We do not find this testimony persuasive as the statute clearly requires the trier of fact to assess the individual's state at the time of the hearing prior to ordering a commitment. *See* I.C. § 12-7-2-96 (stating—in present tense—that a person is gravely disabled if that person "(1) *is* unable to provide for . . . food, clothing, shelter, or other essential human needs; or (2) *has* a substantial impairment or an obvious deterioration of . . . judgment, reasoning,

or behavior that *results* in the individual's inability to function independently") (emphasis added).

[18]     The only other evidence supporting B.J.'s commitment was Dr. Salama's testimony and reports that B.J. had threatened other individuals, Dr. Salama's testimony that B.J. had missed two treatment appointments, and B.J.'s behavior that led the trial court to determine that he was in denial of his mental illness. However, the supreme court held in *T.K.* that threats such as those made by T.K. and B.J., failure to medicate, and a denial of mental illness are not sufficient to prove that an individual is gravely disabled. Accordingly, we must conclude that there also was insufficient evidence here for the trial court to conclude that B.J. was gravely disabled. We are not holding that evidence of threats may never be sufficient evidence of a grave disability, but there was no evidence that B.J. destroyed property or put himself or others in actual danger after he began his treatment. Those were two factors that the *T.K.* Court found significant in determining whether T.K. was gravely disabled. *See T.K.*, 27 N.E.3d at 277.

[19]     Moreover, there was evidence that B.J. was able to meet his needs and function independently. During B.J.'s temporary commitment, B.J. gained and maintained employment at a job that required him to work seventy hours a week and travel frequently. B.J. testified that he was able to dress himself, shower, work, and act as a normal, productive member of society. He also testified that he had shelter in his parents' house. Because we find that there was insufficient evidence to prove that B.J. was gravely disabled, we conclude

that there was also insufficient evidence to support his regular commitment.[4]

We reverse and remand.

Reversed and remanded.

Bradford, J., and Altice, J., concur.

---

[4] Eskenazi argues that even if B.J. was not gravely disabled, his commitment was proper because there was sufficient evidence that he was a danger to others, which is another ground for commitment. *See* I.C. § 12-26-2-5(e). However, the trial court here did not make a determination regarding B.J.'s dangerousness to himself or others. Also, the supreme court considered the same argument in *T.K.* and held that there was not sufficient evidence that T.K. was dangerous. *T.K.*, 27 N.E.3d at 274. Because B.J.'s behavior here was similar to T.K.'s behavior that the *T.K.* Court found was insufficient to prove dangerousness, we necessarily also conclude that there was insufficient evidence here to prove that B.J. was dangerous.