FILED

Dec 12 2017, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Ruth A. Johnson
Indianapolis, Indiana

Valerie K. Boots
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Gregory W. Pottorff
Ice Miller, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil
Commitment of J.B.,

*Appellant-Respondent,*

v.

Community Hospital North,

*Appellee-Pettioner.*

December 12, 2017

Court of Appeals Case No.
49A02-1706-MH-1295

Appeal from the Marion Superior
Court

The Honorable Steven R.
Eichholtz, Judge

Trial Court Cause No.
49D08-1705-MH-18889

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, J.B., appeals the trial court's Order of Regular Commitment, committing J.B. to the custody of Appellee-Petitioner, Community Hospital North (Community North), for care and treatment.

We affirm.

# ISSUE

J.B. raises one issue on appeal, which we restate as follows: Whether the trial court's Order of Regular Commitment is supported by sufficient evidence.

# FACTS AND PROCEDURAL HISTORY

On May 3, 2017, thirty-three-year-old J.B. was admitted to Community North in Indianapolis, Marion County, Indiana, after he refused to leave his brother's house (necessitating the assistance of police officers) and was observed by his mother to be snorting his anti-psychotic medicine through a straw. J.B. has a long-established diagnosis of schizophrenia and has previously been committed for involuntary treatment.

On May 4, 2017, Dr. Kanwaldeep Sidhu (Dr. Sidhu), a psychiatrist, examined J.B. At that time, J.B. self-reported having "paranoia[] and delusional thinking." (Tr. p. 6). Specifically, J.B. believed that "people were out to get [him]," and that "people were against him." (Tr. p. 6). J.B. was experiencing "decreased concentration, poor sleep, anger, irritability, being anxious, having racing thoughts[,] . . . some depression and hopelessness." (Tr. p. 6). Dr.

Sidhu learned that J.B. was homeless and had a habit of snorting or eating heroin.

[6] Thereafter, Dr. Sidhu examined J.B. on a daily basis. He observed J.B.'s symptoms of paranoia and suspiciousness toward other people. In addition to J.B. admitting that he hears voices, hospital staff observed J.B. talking "to what we call internal stimuli." (Tr. p. 8). Hospital staff further ascertained that J.B. "has a really short fuse" and becomes violent and agitated due to his paranoia. (Tr. p. 8). Within a short time after being admitted, J.B. was involved in two physical altercations with other patients, and he made threats to hospital staff, including: "[B]itch, I'll cut your throat and I'll pop you in the knee." (Tr. p. 14).

[7] On May 11, 2017, Community North filed a Petition for Involuntary Commitment, accompanied by Dr. Sidhu's Physician's Statement. On May 18, 2017, the trial court conducted a hearing and subsequently issued an Order of Regular Commitment. In so doing, the trial court found that J.B. suffers from schizophrenia, a psychiatric disorder; he is dangerous to others; he is gravely disabled; and he is in need of custody, care, and treatment at Community North for a period expected to exceed ninety days.

[8] J.B. now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[9] Civil commitment proceedings are intended to both protect the public and "ensure the rights of the person whose liberty is at stake." *Civil Commitment of*

*T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015). "The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements." *Commitment of B.J. v. Eskenazi Hosp./Midtown CMHC*, 67 N.E.3d 1034, 1038 (Ind. Ct. App. 2016). It seems apparent that "everyone exhibits some abnormal conduct at one time or another." *In re Commitment of C.P.*, 10 N.E.3d 1023, 1026 (Ind. Ct. App. 2014), *trans. denied*. Thus, to deprive someone of their liberty through involuntary commitment requires "a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *Id.* (quoting *Addington v. Texas*, 441 U.S. 418, 427 (1979)), *trans. denied*.

[10]     In accordance with due process, "the facts justifying an involuntary commitment must be shown by evidence . . . [which] not only communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment, but . . . also has the function of reducing the chance of inappropriate involuntary commitments." *Commitment of B.J.*, 67 N.E.3d at 1038 (alterations in original) (internal quotation marks omitted). Accordingly, to obtain an involuntary regular commitment order, the petitioner must "prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." *Id.* (quoting Ind. Code § 12-26-2-5(e)). The clear and convincing evidence standard "is defined as an intermediate standard of

proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt." *Id.* Clear and convincing evidence requires the existence of a fact to be highly probable. *Id.* When reviewing the sufficiency of evidence supporting a civil commitment, our court does not reweigh evidence or judge the credibility of witnesses, and we "consider only the probative evidence and the reasonable inferences supporting the judgment." *Id.*

[11] J.B. does not challenge the trial court's determination that he is mentally ill— *i.e.*, that he suffers from schizophrenia. Instead, he contends that there is insufficient evidence to establish that he is either a danger to others or gravely disabled. Although only one of these factors need be established to support an involuntary commitment, we find that the record supports a finding of both.

## I. *Danger to Others*

[12] Clear and convincing evidence that a person is "dangerous" for purposes of the involuntary commitment statute requires a showing of "a condition in which an individual[,] as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." I.C. § 12-7-2-53. The evidence must indicate "that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness." *B.M. v. Ind. Univ. Health*, 24 N.E.3d 969, 972 (Ind. Ct. App. 2015), *trans. denied*. In this case, the trial court specifically found that J.B. was a danger to others, not to himself.

[13] J.B. now contends that Community North presented insufficient evidence of his dangerousness by relying on the testimony of Dr. Sidhu and his mother.

Specifically, Dr. Sidhu testified that J.B. had been in two altercations since his admission at Community North, but J.B. insists that the evidence establishes that he was not the initial aggressor in either of those occurrences. Additionally, J.B.'s mother testified regarding several incidents of aggressiveness and violence on the part of J.B., but because these events occurred more than a year prior to the commitment hearing, J.B. argues they are not determinative of his present dangerousness. We are unpersuaded by J.B.'s claims.

[14]     It is well established that "a trial court is not required to wait until harm has nearly or actually occurred before determining that an individual poses a substantial risk of harm to others." *C.J. v. Health & Hosp. Corp. of Marion Cnty.*, 842 N.E.2d 407, 410 (Ind. Ct. App. 2006). Here, Dr. Sidhu unequivocally testified that there is a "[v]ery, very high [and imminent] risk" that J.B. will harm others. (Tr. p. 12). Dr. Sidhu described that J.B. "is always on the edge" and paces the hospital floor despite repeated redirection from the staff. (Tr. p. 12). Dr. Sidhu acknowledged that the other two patients with whom J.B. fought were also aggressive and disorganized, but the fact remains that J.B. involved himself in two physical fights within a two-day period. Furthermore, J.B. "frequently gets into verbal altercations in the hospital" and often threatens the staff. (Tr. p. 15). In one instance, J.B. threatened, "[B]itch, I'll cut your throat and I'll pop you in the knee." (Tr. p. 14). *See C.J.*, 842 N.E.2d at 410 (finding sufficient evidence of dangerousness where the patient had threatened to kill himself and his family, threatened hospital staff members, and struck

another patient). As a result of J.B.'s outbursts, the hospital has had to give him as-needed medications and injections and place him in seclusion. Dr. Sidhu opined that J.B.'s agitation stems from his paranoia, and while medications had begun to take effect by the time of the commitment hearing, Dr. Sidhu testified that J.B. would "need[] many months of medications before a proper response can be achieved." (Tr. p. 14). Furthermore, notwithstanding the relevance of J.B.'s mother's testimony concerning events that occurred in 2015, J.B.'s mother cited his history of violence and refusal to take his medication as support for her ongoing concern that J.B. "would hurt everyone in the family when he doesn't take his medication." (Tr. p. 30). Accordingly, we find that the foregoing evidence clearly and convincingly establishes that J.B. is "dangerous" for purposes of the involuntary commitment statute. *See* I.C. §12-26-2-5(e).[1]

## II. *Gravely Disabled*

Alternatively, even though our finding of dangerousness is conclusive to support J.B.'s involuntary regular commitment, we also find that the evidence supports a determination that J.B. is "gravely disabled." I.C. § 12-26-2-5(e). "Gravely disabled," for purposes of involuntary commitment,

---

[1] We decline Community North's request to take judicial notice of certain pending criminal matters against J.B. as further evidence of his dangerousness. The alleged crimes took place after the trial court issued its Order of Regular Commitment and after the initiation of this appeal. As these incidents were not presented to the trial court for consideration, they are irrelevant to our review.

means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual: (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. § 12-7-2-96.

[16] The record establishes that, prior to being hospitalized, J.B. was homeless, and based on his conduct, he was no longer welcome to stay with his mother or brother as he had done in the past. Dr. Sidhu explained that J.B. is unemployed, has only an eighth-grade education, and is disqualified from certain employment due to his criminal record. As a result of J.B.'s paranoia, Dr. Sidhu opined that J.B. is unable to properly function on his own. Specifically, J.B.'s chronic mental illness "has the symptoms of many [*sic*] delusional thinking, paranoia, hallucinations. And issues with forgetfulness, concentration, . . .which affect the functioning in such a way that the person is unable to maintain his social, occupational and inter-personal duties." (Tr. p. 7). Similarly, J.B.'s mother testified that J.B. has "never been able to care for himself. Ever." (Tr. p. 30). Instead, he "just wanders around. He doesn't bathe" based on his perceived notion that he "don't [*sic*] smell," and he has gone days without eating. (Tr. p. 32). J.B.'s mother indicated that J.B.'s prior attempts at employment were short-lived as a result of his paranoia symptoms—*i.e.*, in one instance, he quit a job over his belief that his employer or co-workers were going to throw him off the roof. *See A.L. v. Wishard Health*

*Servs., Midtown Cmty. Mental Health Ctr.*, 934 N.E.2d 755, 761 (Ind. Ct. App. 2010) (citing an inability to maintain stable housing and employment due to mental illness as evidence of being gravely disabled), *trans. denied*. Moreover, both Dr. Sidhu and J.B.'s mother cited concerns about J.B.'s historical non-compliance with taking his medication. Although J.B. appeared to be taking his medication while in the hospital, lab results indicating lower-than-expected levels of the drugs gave rise to a concern that J.B. was not taking everything as directed.

[17] Conversely, J.B. relies on his testimony during the commitment hearing as refuting evidence of a grave disability. Specifically, J.B. testified that he eats every day and takes showers at the hospital. He stated that, upon his release, he planned to stay at the Wheeler Mission and hoped to obtain a job with his former employer, a restaurant. Furthermore, J.B. acknowledged that he has schizophrenia but argued that "the whole situation is exaggerated." (Tr. p. 36). *See A.L.*, 934 N.E.2d at 761 (finding that the patient's refusal to acknowledge the severity of her mental illness and to seek treatment on her own, in part, evidenced a substantial impairment or obvious deterioration of judgment, reasoning, or behavior). We find that J.B.'s arguments amount to a request that we reweigh evidence, which we decline to do. Here, the trial court found that J.B. is gravely disabled, and the record supports a finding that J.B.'s mental illness prevents him from providing for his own basic needs and has resulted in his inability to function as an independent adult.

# CONCLUSION

Based on the foregoing, we conclude that clear and convincing evidence supports the trial court's Order of Regular Commitment.

Affirmed.

Baker, J. and Brown, J. concur