## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 14 2020, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Sean T. Dewey
Stephen E. Reynolds
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| C. H., *Appellant-Petitioner,* <br><br> v. <br><br> Community Health Network, *Appellee-Respondent.* | February 14, 2020 <br><br> Court of Appeals Case No. 19A-MH-1891 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Melanie Kendrick, Magistrate <br><br> Trial Court Cause No. 49D08-1907-MH-26523 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, C.H., appeals the trial court's Order, granting Appellee-Petitioner's, Community Health Network, Inc. (Community), petition for temporary involuntary commitment.

We affirm.

# ISSUES

C.H. presents this court with two issues on appeal, which we restate as follows:

> (1) Whether the trial court made the requisite findings to support the temporary commitment Order; and
>
> (2) Whether Community presented clear and convincing evidence to sustain the trial court's conclusion that C.H. was gravely disabled.

# FACTS AND PROCEDURAL HISTORY

C.H. is a thirty-two-year old male who suffers from Schizoaffective Disorder. He has a history of mental illness and has been treated for mental health issues by facilities in Indianapolis, Indiana, and Las Vegas, Nevada. He lives in an apartment in Indianapolis, pays his rent, buys groceries, and cooks for himself. His income consists of social security disability payments.

On June 25, 2019, C.H. received a court summons related to an alleged credit card debt. As he believed that the summons constituted harassment, he set fire to the documents on his front porch and posted a video of the fire to Facebook. Neighbors alerted the police department. When he heard the police sirens

approach, C.H. wrote "Cat. Schizo" on his forehead, short for Catatonic Schizophrenic, and posted a livestream video of himself being taken into police custody. (Transcript p. 6). The police officers took C.H. to Community, where he was admitted.

[6] Shortly after admission on June 25, 2019, Community filed an application for emergency detention and a physician's statement. C.H. was examined by Syed Khan, a psychiatrist with Community (Dr. Khan), who later filed a report following emergency detention and a physician's statement, asserting that in his professional opinion, C.H. was suffering from Schizoaffective Disorder, was dangerous and gravely disabled, and was in need of a temporary commitment for a period not to exceed ninety days.

[7] On July 12, 2019, the trial court conducted a hearing on the petition. Evidence was presented that when he first examined C.H., Dr. Khan found C.H. to be "religiously preoccupied, paranoid, suspicious, guarded, and lacking insight." (Tr. p. 21). C.H. was "upset about being on a psychiatric unit. Was unhappy that lab tests were being ordered and medications were being ordered. [C.H.] said he would refuse all of that." (Tr. p. 22). C.H. explained to Dr. Khan that "he burned the[] papers [on his porch] as an offering to pag[a]n idols and that he was inhaling the smoke as his way of worshipping god." (Tr. p. 22). Dr. Khan examined C.H. on numerous occasions after being admitted and prior to the hearing, he diagnosed C.H. with Schizoaffective Disorder. As a basis for his diagnosis, Dr. Khan referred to C.H.'s "multiple [] admissions where he has presented with both mood episodes as well as psychotic episodes." (Tr. p. 23).

As examples of C.H.'s delusional thinking, Dr. Khan mentioned that C.H. believed that he was "literally slapped by god," that he has hallucinations about talking to god, and that he was "operating on special powers." (Tr. pp. 23-24). As further support for his diagnosis, Dr. Khan pointed to

> [t]he fact that [C.H.] has a very disorganized thought process; his delusions were extremely circumstantial and extremely tangential. With responses he derailed often. His responses were not logical []. He demonstrated that he does have a delusional belief system. He did indicate that he made some alarming statements including amputating his own penis, including statements about murdering the government and murdering officials, etc. [] He did make statements that he did threaten family members, threatened to kill them, etc.

(Tr. p. 24). C.H. was offered medication while at Community but refused to take it. Dr. Khan concluded that C.H. suffered "a substantial impairment or an obvious deterioration of his judgment, reasoning or behavior that result in his inability to function independently." (Tr. p. 25). "Schizoaffective Disorder is a chronic mental illness that has a life-long course. If untreated it is only likely to worsen in severity and likely to be more associated with more dangerousness both to [C.H.] and others. It is a condition that needs to be treated and the consequences will be great if untreated." (Tr. p. 25). In his present condition, Dr. Khan did not believe C.H. could take care of his essential needs. He clarified that C.H. "has some family support now. And he receives some government assistance. And if [] this illness continues he would perhaps lose the family support and maybe even assistance and he is likely to worsen." (Tr. p. 26). Dr. Khan clarified that he believed C.H. presented a substantial risk to

harm himself in light of a prior suicide attempt, a history of not eating, and starting a fire on his porch. In addition, Dr. Khan noted the threatening statements C.H. made on Facebook and through other means, in which he threatened to kill family members and government officials, as well as hurting himself by dismemberment, "including amputating his own penis." (Tr. p. 24).

[8] Dr. Khan opined that a temporary commitment was the least restrictive treatment available and necessary in order to treat C.H.'s mental illness and improve the quality of his life. His treatment plan included "taking more anti-psychotic medication, preferably the long acting injectable kind." (Tr. p. 29). Once stabilized, C.H. would transition to a community mental health center for outpatient treatment, medication, and psychotherapy.

[9] C.H.'s brother, P.S., explained that he had concerns about C.H.'s ability to care for himself, as he has issues taking care of money. P.S. also described C.H.'s apartment as "very, very, very disheveled . . . it is in bad shape. He was going to get evicted because of it and we [] straightened up before all of this." (Tr. pp. 43-44). P.S. confirmed that C.H. had been on medication in the past but had stopped taking it either in 2015 or 2016. According to P.S., C.H.

> does not want to take medication. He wants nothing to do with it. He finds it being a – like a persecuting him by making him take it. And I guess the last time when he went in to the hospital they made him take it.

(Tr. p. 40).

[10]  At the conclusion of the hearing, the trial court granted Community's request for a temporary commitment, finding by clear and conclusive evidence that C.H. is suffering from Schizoaffective Disorder, which is a mental illness, is gravely disabled, and is in need of custody, care, and treatment at Community for a period of time not expected to exceed ninety days. The trial court also granted Community an order to treat unless C.H. did not substantially benefit from the medications.

[11]  C.H. now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Requisite Findings*

[12]  As an initial issue, C.H. contends that the trial court failed to make the requisite statutory finding to sustain a conclusion of grave disability. Specifically, C.H. asserts that the trial court's statement at the close of the hearing on Community's petition concluding that C.H. "is currently gravely disabled in that there is some substantial impairment in judgment that affects his ability to function," was statutorily insufficient to involuntarily commit him. (Tr. p. 54)

[13]  However, even though the trial court paraphrased the statutory definition during the hearing, the trial court explicitly concluded in its temporary commitment Order that C.H. "is gravely disabled, as defined in [I.C. §] 12-7-2-96." (Appellant's App. Vol. II, p. 12). As that statute includes the definition of gravely disabled, as approved by the legislature, C.H.'s argument is without merit. *See, e.g., Heiligenstein v. Matney*, 691 N.E.2d 1297, 1301 (Ind. Ct. App.

1998) (finding trial judge's remarks were "not necessarily indicative of the legal standard he will apply" and "[o]nly an examination of a trial judge's final decision can clearly reveal which legal standard [actually] was applied to the evidence.").

## II.  *Sufficiency of the Evidence*

C.H. contends that there was insufficient evidence to support his involuntary commitment because Community failed to establish that C.H. was gravely disabled, as defined by statute.[1]

"[T]he purpose of civil commitment proceedings is dual:  to protect the public and to ensure the rights of the person whose liberty is at stake." *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015). The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Id.* To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by "evidence . . . [which] not only communicates the relative importance our legal system attaches to a decision ordering an

---

[1] On appeal, C.H. does not challenge the trial court's finding that he is suffering from a mental illness.

involuntary commitment, but . . . also has the function of reducing the chance of inappropriate involuntary commitments." *Id.*

[16] Indiana law allows an individual to be involuntarily committed if the petitioner establishes by clear and convincing evidence that "(1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." I.C. § 12-26-2-5(e). Indiana Code section 12-7-2-96 defines "gravely disabled" as:

> A condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> (1) Is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>
> (2) Has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

[17] It is not necessary to prove both prongs to establish grave disability. *W.S. v. Eskenazi Health, Midtown Cmty. Mental Health*, 23 N.E.3d 29, 34 (Ind. Ct. App. 2014), *trans. denied.* In reviewing the sufficiency of the evidence supporting an involuntary civil commitment, we consider the probative evidence and reasonable inferences supporting the order, without reweighing the evidence or assessing witness credibility. *Civil Commitment of J.B. v. Cmty. Hosp. N.*, 88 N.E.3d 792, 795 (Ind. Ct. App. 2017). We will affirm if a reasonable trier of fact could find the necessary elements proven by clear and convincing evidence. *Id.* Clear and convincing evidence requires the existence of a fact to be highly

probable. *Id*. There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom. *Commitment of J.B. v. Midtown Mental Health Ctr*., 581 N.E.2d 448, 451 (Ind. Ct. App. 1991), *trans. denied*.

[18]    Focusing on an implicit temporal element included in the gravely disabled prong, C.H. references Dr. Khan's testimony that speaks of future contingencies. Specifically, during the hearing, Dr. Khan noted that although C.H. currently has family support and receives government assistance, that might change "if this illness continues" and he "would perhaps lose the family support and maybe even assistance." (Tr. p. 25). He contends that "Dr. Khan's testimony implicitly acknowledged that C.H. was currently taking care of all his essential needs when he speculated" about possible future scenarios. (Appellant's Br. p. 14).

[19]    In *B.J. v. Eskenazi Hospital/Midtown CMHC*, 67 N.E.3d 1034, 1040 (Ind. Ct. App. 2016), we reversed the trial court's order of involuntary regular commitment where the treating psychiatrist—who was the only witness to testify with regards to B.J.'s grave disability—"evaluated B.J.'s hypothetical state based on future contingencies" that could occur if B.J. did not have his parents' support, or if B.J. did not adhere to treatment. We noted that apart from the doctor's testimony, the only evidence to support the commitment were threats that B.J. made to other individuals, his missed appointments, and his behavior at the hearing—which we determined to be insufficient. *Id*. The court noted that:

> We are not holding that evidence of threats may never be sufficient evidence of a grave disability, but there was no evidence that B.J. destroyed property or put himself or others in actual danger after he began his treatment.

*Id.*

[20] Similarly, in *T.K.*, 27 N.E.3d at 276-77, T.K. was employed, rented his own home, owned two vehicles, and otherwise "was not at risk of suffering a lack of food, clothing or shelter." T.K. denied he had a mental illness, refused treatment, and had threatened others verbally. *Id.* at 277. The petitioner's expert witness testified that he "personally did not believe that [T.K.] would be a danger to self or others[.]" *Id.* at 276. Our supreme court found that "at best, the evidence suggests that T.K.'s loud, boisterous, and rude public behavior harmed his reputation and made others not want to be around him." *Id.* "T.K. made no physical outbursts, destroyed no property, did not put himself or others in actual danger with idiosyncratic behavior, and was not at risk of suffering a lack of food, clothing, or shelter." *Id.* Our supreme court concluded that there was not sufficient evidence to support a civil commitment on grounds of grave disability. *Id.*

[21] We find *B.J.* and *T.K.* to be inapposite to the situation at hand. Unlike both B.J. and T.K., C.H.'s most recent admission to Community was prompted by C.H.'s destruction of property, setting fire to legal papers on his front porch, and writing "Cat Schizo" on his forehead while live streaming his arrest on Facebook. (Tr. p. 6). Dr. Khan described C.H.'s behavior upon admission as

"religiously preoccupied, paranoid, suspicious, guarded and lacking insight" when they first met. (Tr. p. 21). C.H. told him that "he burned the [] papers as an offering to pag[a]n idols and that he was inhaling the smoke as his way of worshipping god." (Tr. p. 22). This behavior continued to be displayed during the hearing of Community's petition in which C.H. made frequent reference to biblical verses and displayed incoherent thinking.

[22] During the course of his hospital stay, C.H. displayed mood episodes and delusional thinking, both of which supported his diagnosis of Schizoaffective Disorder. Dr. Khan mentioned that C.H. believed that he was "literally slapped by god," that he had hallucinations about talking to god, and that he was "operating on special powers." (Tr. pp. 23-24). C.H. denied having a mental illness and refused all medication. While a denial of mental illness and refusal to medicate alone cannot support a finding of grave disability, these factors may be included in our analysis. *See, e.g., Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind. Ct. App. 2004) (patient's refusal to accept his mental illness and cooperate with his treatment, paired with his history of mental health issues and destructive behavior, was sufficient to support a finding of grave disability).

[23] Evidence was presented that due to his mental illness, C.H. is unemployed. P.S., C.H.'s brother, testified that without treatment, C.H. would lose his family's support, explaining that C.H.'s family members "are at [their] wits end." (Tr. p. 41). Although they "want the best for [C.H.]," "everybody in [the] family is at the point where they cannot deal with it anymore." (Tr. p. 41). P.S. described that C.H. had planned to move back to Las Vegas earlier in

the year to live with his mother, but their mother asked P.S. to ensure that C.H. would not do so "because of how he was acting over the internet again." (Tr. p. 37). P.S. admitted that he "[o]ne hundred percent long term" had concerns about C.H.'s ability to care for himself. (Tr. p. 37). P.S. referenced C.H.'s gambling problems in the past and described C.H.'s apartment as "very, very, very disheveled[.]" (Tr. p. 43).

[24] C.H. admitted to making threatening statements to his family members and on social media. While C.H. characterized his social media posts as "art," Dr. Khan testified that these threats were "likely to bring upon some harm to himself and possibly to others." (Tr. p. 27). "He has threatened to kill family members, his brother, his sister, [and] other family members. He has made public posts on social medial about wanting to murder people, etc." (Tr. p. 27).

[25] Viewing the totality of the evidence, the trial court received evidence from multiple people, including C.H., that C.H. was unable to function independently by himself and that there was a substantial impairment of his judgment. Physical and testimonial evidence was presented of C.H.'s threats to harm himself and others. Accordingly, the trial court could find by clear and convincing evidence that C.H. was gravely disabled. We affirm the trial court's Order to temporarily commit C.H.

# CONCLUSION

[26] Based on the foregoing, we conclude that the trial court made the requisite findings to support the temporary commitment Order; and Community

presented sufficient evidence to sustain the trial court's conclusion that C.H. was gravely disabled.

[27] Affirmed.

[28] Baker, J. and Brown, J. concur