

FILED

Jan 08 2025, 8:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Commitment of J.D.,

*Appellant-Respondent,*

v.

Richard L. Roudebush Veterans Affairs Medical Center,

*Appellee-Petitioner.*

January 8, 2025

Court of Appeals Case No.
24A-MH-2876

Appeal from the
Marion Superior Court

The Honorable
David Certo, Judge

Trial Court Cause No.
49D08-2411-MH-52078

**Opinion by Senior Judge Robb**
Judge Mathias and Judge Tavitas concur.

**Robb, Senior Judge.**

## Statement of the Case

J.D. appeals the trial court's order of temporary civil commitment. He claims the Richard J. Roudebush Veterans Affairs Medical Center ("the Center") failed to provide sufficient evidence to support the court's order. Concluding that the evidence is sufficient, we affirm.

## Facts and Procedural History

J.D. arrived at the Center's emergency department on November 12, 2024. He was there voluntarily, and he explained he needed medication but was unable to contact his regular doctor.

J.D. is sixty-eight years old, with a history of mental health hospitalizations, including a stint at the Center earlier in 2024. In 1977, he was diagnosed with schizoaffective disorder, bipolar type. J.D.'s current treating psychiatrist explained J.D.'s illness "suggest[s]" that "he has psychotic symptoms at baseline when he's not medicated[.]" Tr. p. 18. J.D. also has a history of manic episodes.

[4] J.D. was unhoused at the time of his arrival. His elderly mother had previously been involved in his care, but J.D. described her as "a devil" and subsequently refused to allow his treatment team to speak with her about his status. *Id.* at 25.

[5] The Center's personnel transferred J.D. from the emergency department to inpatient care under circumstances not explained in the record. After J.D. began receiving inpatient treatment, he displayed "disorganized kind of disruptive intrusive behavior[.]" *Id.* at 17. For example, during one encounter with his psychiatrist, he made "gestures or threats about stating something to the tune of stabbing a nurse and kind of doing a gesture like this as if with a pen." *Id.* at 16. On another occasion, J.D. reported that he had struck a Center employee the previous night.

[6] J.D. displayed other symptoms consistent with his diagnosis of schizoaffective disorder, including "talking to himself, him talking at a wall, him writing down on . . . sheets of notebook paper, things that are kind of disorganized and nonsensical." *Id.* at 17. In addition, he showed signs of delusional thinking, which manifested as "hyper religiosity." *Id.* at 19. J.D. told a doctor that other patients at the Center were not getting better due to medications, but because J.D.'s presence was healing them.

[7] J.D.'s physicians prescribed two medications for him: an antipsychotic drug and a mood stabilizer. He had previously taken those medicines on an outpatient basis. After being admitted to the Center, J.D. often refused to take his medications or would only accept them at certain times of day. And the

times at which he accepted the medications changed from day to day. J.D.'s psychiatrist later explained that taking the medications at a consistent time and dosage over "many days" is important to address J.D.'s symptoms. *Id.* at 20.

[8] J.D.'s psychiatrist concluded J.D. had a "mixed insight" into his illness and treatments. *Id.* at 25. J.D. acknowledged being on medications in the past, but he did not appear to have "insight as it pertains to taking the medications, to improve his symptoms, to organize a meaningful discharge." *Id*. As a result, the psychiatrist did not see any improvements in J.D.'s symptoms or in his approach to acknowledging and managing his illness, explaining that J.D.'s inconsistency in taking medications prevented him from learning which dosage levels would be effective.

[9] Based on J.D.'s frequent refusal of medications and other signs of disorganized behavior, the psychiatrist had concerns about J.D.'s ability to meal plan, shop for groceries, or obtain transportation on his own. In particular, J.D.'s challenges in communicating with others while not on medication indicated he would not function well in an outpatient setting. The psychiatrist was further concerned that J.D. would likely get into altercations in public.

[10] J.D.'s treatment team did not engage in discharge planning with him because he failed to show improvement. He told his psychiatrist that, upon release, he intended to seek medical marijuana from a different Indianapolis hospital and get a meal at a specific restaurant.

[11] On November 18, 2024, the Center petitioned to have J.D. involuntarily committed to its care. The Center, by one of J.D.'s physicians, stated J.D.'s mental illness placed him "in danger of coming to harm because of his inability to provide for his food, clothing, shelter, or other essential human needs." Appellant's App. Vol. II, p. 13. In particular, the Center asserted J.D. would not take his medications or participate in a treatment plan.

[12] The trial court scheduled an evidentiary hearing for November 25. On the night before the hearing, J.D. slept for only four hours. On previous nights, he had intermittent periods of decreased sleep. J.D.'s psychiatrist thought J.D.'s inability to sleep was "suggestive of decompensation of his illness." Tr. p. 23.

[13] The court held the hearing as scheduled, and J.D. testified. He conceded he was mentally ill. But J.D. also testified he was being stalked by a nurse at the Center. When asked if he had housing options upon discharge from the Center, J.D. stated only that another patient had given him a number to call for housing, but he had lost the number.

[14] The trial court issued an order granting the Center's petition and committing J.D. to the Center for no more than ninety days. The court determined J.D. was gravely disabled and "incapable of housing, feeding, and clothing himself." Appellant's App. Vol. II, p. 11. This appeal followed.

## Discussion and Decision

[15] J.D. claims the Center failed to present sufficient evidence to demonstrate he is gravely disabled. When reviewing the sufficiency of the evidence supporting an

order of civil commitment, we consider only the probative evidence and reasonable inferences supporting it, without weighing evidence or assessing witness credibility. *F.L. v. Cmty. Fairbanks Behav. Health*, 245 N.E.3d 1033, 1035 (Ind. Ct. App. 2024), *trans. denied*. We will affirm if clear and convincing evidence supports the trial court's order. *Id.* "Clear and convincing evidence requires proof that the existence of a fact is 'highly probable.'" *Id.* (quoting *Matter of Commitment of C.N.*, 116 N.E.3d 544, 547 (Ind. Ct. App. 2019)).

[16] A petitioner in an involuntary commitment proceeding "is required to prove by clear and convincing evidence that . . . the individual is mentally ill and either dangerous or gravely disabled; and . . . detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e) (2007). J.D. does not dispute he is mentally ill. We focus on the question of grave disability.

[17] The General Assembly has defined "gravely disabled" as

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Ind. Code § 12-7-2-96 (1992).

[18] Because Indiana Code section 12-7-2-96 is written in the disjunctive, "a trial court's finding of grave disability survives if we find that there was sufficient evidence to prove either that the individual was unable to provide for his basic needs or that his judgment, reasoning, or behavior was so impaired or deteriorated that it resulted in his inability to function independently." *Commitment of B.J. v. Eskenazi Hosp./Midtown CMHC*, 67 N.E.3d 1034, 1039 (Ind. Ct. App. 2016). In addition, Section 12-7-2-96 is written in the present tense and "requires the trier of fact to assess the individual's state at the time of the hearing" rather than consider "future contingencies." *Id.* at 1040.

[19] In J.D.'s case, he was inconsistent in taking medications. As a result, his psychiatrist did not see any improvement in J.D's symptoms and could not determine the correct dosages for J.D.'s medications. In addition, J.D. engaged in aggressive behavior while in the Center, punching one employee and threatening to stab another. And J.D.'s poor sleep suggested his symptoms were worsening rather than improving.

[20] J.D. had only a "mixed insight" into his mental health diagnosis, as his psychiatrist explained: "I don't have reason to believe that he has insight as it pertains to taking the medications, to improve his symptoms, to organize a meaningful discharge." Tr. p. 25. Indeed, J.D. implied he knew better than the treatment team what his medication dosages should be, testifying: "I know how this works. I know my body." Tr. p. 33.

[21] J.D. was unhoused when he arrived at the Center, and as of the time of the hearing, he had no plans for housing upon discharge. Instead, he said only that he intended to obtain marijuana and dine at a specific restaurant. J.D.'s psychiatrist concluded that J.D. could not successfully obtain shelter or organize a shopping trip without further inpatient treatment. In addition, J.D. was at risk of getting into altercations in public, based on his aggressive behavior.

[22] J.D. argues that he maintained appropriate hygiene and ate regularly while at the Center. He also claims he could obtain food and shelter from entities that provide services to the unhoused. These arguments amount to requests to reweigh the evidence, which our standard of review forbids.

[23] J.D. also notes he arrived at the Center voluntarily to seek medication, which he claims demonstrates he takes responsibility for his medical needs. But the record is silent as to whether, prior to presenting himself at the emergency room, J.D. displayed the same delusional thinking and disordered behavior that he displayed shortly after he was admitted to the Center as a patient. Further, J.D.'s arrival at the Center of his own free will, with some recognition that he needs treatment, is not inconsistent with his psychiatrist's explanation that J.D. is unwilling to take medications as directed. And J.D.'s refusal to stick to a treatment plan resulted in the medicine being inadequate to treat his serious symptoms. We conclude the Center provided sufficient evidence to establish, under the clear and convincing evidence standard, that J.D. cannot provide for his essential human needs on his own due to his mental illness. *See F.L.*, 245

N.E.3d at 1034, 1036 (evidence sufficient to support determination patient was gravely disabled; patient initially sought help by calling 911 but subsequently refused to take medicine and displayed deterioration in judgment rendering her unable to meet her essential needs).[1]

## Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

Mathias, J., and Tavitas, J., concur.

ATTORNEY FOR APPELLANT

Talisha R. Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Rachel B. Gallagher
Special Assistant United States Attorney
Veterans Administration
Indianapolis, Indiana

---

[1] Because there is sufficient evidence to sustain the trial court's judgment on grounds of grave disability, we need not address the second element of Indiana Code section 12-7-2-96, which addresses a patient's inability to function independently due to a substantial impairment or an obvious deterioration of the patient's judgment.